## DAVIS v. MOYE.

(Court of Civil Appeals of Texas. Galveston. March 11, 1913. Rehearing Denied March 27, 1913.)

1. ADVERSE POSSESSION (§ 109*)—RELEASE OF RIGHTS ACQUIRED — FRAUD — NECESSITY OF RELIANCE ON REPRESENTATIONS.

A representation by the agent of the record owner of land to plaintiff, who had title by adverse possession in order to induce a release of plaintiff's rights that other squatters on the land had agreed to sign releases, did not invalidate the release where plaintiff testified that he would have executed the release if such representation had not been made, since a party cannot avoid a contract for fraud or misrepresentation, unless he was induced thereby to execute the contract.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 629–635; Dec. Dig. § 109.*]

2. ADVERSE POSSESSION (§ 109*)—RELEASE OF RIGHTS ACQUIRED—VALIDITY OF ASSENT—FRAUDULENT REPRESENTATIONS.

Where the attorney for the record owner of land in a conversation with plaintiff, who had title by adverse possession, was told by plaintiff that he had been living on the place for 20 years, but was also informed by plaintiff that he did not intend or want to take anything from the record owner, a representation by the attorney to induce a release of plaintiff's rights in consideration of a conveyance of part of the land that, if he did not sign the release, he would lose his home did not avoid the release, since it was but the expression of the attorney's opinion upon a legal question, and was justified by plaintiff's statement from which it might be inferred that he was not claiming the land adversely to the record owner.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 629–635; Dec. Dig. § 109.*]

3. CANCELLATION OF INSTRUMENTS (§ 47*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action to cancel a release of his rights by a person having title to land by adverse possession, evidence *held* insufficient to show that the execution of the instrument was induced by false and fraudulent representations, or that any advantage of any kind was taken in procuring the release.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 102, 103; Dec. Dig. § 47.*]

4. JUDGMENT (§ 251*) — CONFORMITY TO PLEADINGS.

In an action by a person having title to land by adverse possession to cancel his release of his rights to the record owner for fraud, where he did not plead that the land was his homestead, a judgment setting aside the release because the land was plaintiff's homestead, and the instrument not signed by his wife, could not be sustained, even though the evidence showed that the land was his homestead.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 437; Dec. Dig. § 251.*]

Appeal from District Court, Tyler County; W. B. Powell, Judge.

Action by Jim Moye against Mrs. C. G. Davis. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Joe W. Thomas, of Woodville, for appellant. Harper & Goodwin, of Woodville, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against the appellant to recover the title and possession of a tract of 160 acres of land on the L. Thunar survey in Tyler county. The petition alleges title in plaintiff under the statute of limitation of ten years. It further alleges that an acknowledgment of tenancy and release to defendant of plaintiff's claim to all of said land, except a tract of 30 acres thereof, executed on August 22, 1906, was obtained from him by an agent of defendant by "false and fraudulent representations." The substance of the allegations as to said fraudulent representations are that the agent of defendant, who induced plaintiff to sign the release, and who was a lawyer, told plaintiff that the land upon which he was then living (being the 160 acres in controversy) did not belong to plaintiff, and he could never acquire title thereto by possession; that it belonged to defendant, Mrs. Davis, and that she would take it from plaintiff and leave him without a home in his old age, but that, if plaintiff would sign the acknowledgment of tenancy and release of his claim to all of said land, the defendant would make him a deed to 30 acres, including his improvements; that said agent also told him that other parties, who held possession of other portions of the larger tract of land of which the 160 acres was a part, had agreed to execute similar instruments to that plaintiff was asked to sign; that each and all of these representations were false and were made by said agent for the purpose of deceiving plaintiff and inducing him to sign said instrument; that plaintiff was very old, being at that time over 80 years of age, was infirm both in mind and body, was unable to read or write, and was wholly ignorant of his legal rights, and that he relied upon the superior knowledge of said agent, and believing his statements to be true, and that unless he executed said instrument he would lose his home, was thereby induced to sign said instrument. It is further alleged in said petition that, at the time said instrument was executed, plaintiff had good and perfect title to the land under the ten years' statute of limitation, but was ignorant of his right and title so acquired, and relied upon the false representations of said agent that he had no title thereto. It is also alleged that

said agent told plaintiff that if the other persons in possession of portions of defendant's said larger tract of land, of which the 160 acres in controversy is a part, did not execute similar releases to the one signed by plaintiff, the instrument executed by plaintiff would not be binding upon him, but would become null and void, and that he (plaintiff), when he thereafter discovered that none of said parties had signed any release, considered said release so signed by him as being of no further force or effect, and did not know that any claim was asserted thereunder by the defendant until January 26, 1912, when it was filed for record by the defendant, which was after this suit was brought and the case had been set for trial. The prayer of the petition is for the recovery of the land "and for such other and further relief, general and special, in law and in equity as plaintiff may be entitled to."

The defendant's answer contains general and special exceptions to the petition and a plea of not guilty. Defendant also specially pleaded the execution of said acknowledgment of tenancy and release by plaintiff of his claim to all of said 160 acres of land, except a tract of 30 acres thereof, including plaintiff's improvements, and tendered plaintiff a deed to said 30 acres duly executed and acknowledged by the defendant. The cause was tried in the court below without a jury, and judgment was rendered in favor of plaintiff for all of the 160 acres of land.

The evidence shows that the defendant has a record title to the L. Thunar 1,280-acre survey. The 160 acres in controversy is a part of the 1,280-acre tract. Plaintiff settled upon this 1,280-acre tract about 25 years before this suit was filed, and has lived thereon continuously since that time. When he went on the place, he built a house, in which he has since lived, and put a small field of 10 or 12 acres in cultivation, and has cultivated it continuously since. While the evidence is conflicting and far from satisfactory on the issue of his claim of ownership and its extent, there is evidence in the record sufficient to sustain the finding of the trial court that he has claimed 160 acres of the land ever since he settled on it. He had the 160 acres claimed in his petition surveyed in 1901. While it is not shown that he claimed this exact 160 acres prior to that time, as before stated, the evidence is sufficient to show that he claimed 160 acres for more than ten years prior to the 22d day of August, 1906, but no part of the land has been inclosed except the field of 10 or 12 acres. He was married when he went on this land, and his wife has lived there with him continuously since that time. On August 22, 1906, plaintiff executed the following instrument:

"State of Texas, County of Tyler.

"Know all men by these presents that this instrument witnesseth that whereas James Moye, of the county of Tyler, state of Texas, had paid unto Mrs. Camilla G. Davis of Dallas, Texas, the sum of thirty-eight ($38.00) dollars, that the said Mrs. Camilla G. Davis hereby agrees to make unto the same James Moye a good and sufficient deed for (30) thirty acres of the Lewis Thunar 1,280-acre survey in Tyler county, Texas, said thirty acres to be conveyed so as to begin at the stake on the west boundary line of the said Thunar survey 340 vrs. south of the Sam Bean survey or claim, same being a part of the Thunar survey. Thence south 350 vrs. to a stake for corner. Thence east 475 vrs. to stake for corner. Thence north 350 vrs. to edge of old field sweetgums vrs. S. 45 E. 25 vrs. Thence west 475 vrs. to beginning corner pine 18 inches dis. S. 46 E. 2½ vrs. and a pine 20 in. dia. N. 20 E. 5 vrs. And it is agreed and understood that the said James Moye is to release all claim or claims that he has or may have had to any other part of the said Lewis Thunar survey. And that he hereby acknowledges the said Mrs. Camilla G. Davis as the true owner of said survey.

"Witness our hands this 22d day of August, A. D. 1906.

　　"[Signed on other side]　　　his
　　　　　　　　　　　　"James X Moye.
　　　　　　　　　　　　　　mark

"State of Texas, County of Tyler.

"Before me, John W. Wilson, a notary public in and for Tyler county, Texas, on this day personally appeared James Moye, well known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

"Given under my hand and official seal this 22d day of August, A. D. 1906.

　　　　"[Signed]　John W. Wilson,
　　"Notary Public, Tyler County, Texas."

In regard to the execution of this instrument, plaintiff testified as follows: "It was just this way: I always tries to tell the truth; he come there and come up to the gate on his horse, and there was nobody there but me. I was there sick, and he stepped on the gallery and hailed and I told him to come in, and he come in and he got to talking to me about this land, and he said it was Madam Davis' land, and that he was a lawyer, and we had no right to that land; he said she didn't tell me to go on that land, and I had no right to go on it and it belonged to her, and, after he told me that, I was always afraid of white folks anyhow, that put a fright on me and I was afraid I would be without a home in my old age, but he told me, he said, 'If you sign this here, Mrs. Davis will give you a deed to 30 acres, including your home;' and he said all the others agreed to sign, and, if they don't do it, this here will go blank. That has been five years ago."

In answer to the question of whether he would have signed the instrument if Mr. Wilson had not told him that other squatters

on the land had agreed to sign one, plaintiff replied: "Yes, sir; he told me if I did not sign this instrument I would be without a home." He further testified on cross-examination: "I made this statement to Mr. Wilson. I said, 'Now, Mr. Wilson, me and my wife is getting old, and if Mrs. Davis will take this away from me I will be satisfied if she will let us have a little home here, about 30 acres, if they take it around from the improvements. I ask you to get me a home. If you would give me 30 acres and any one else could have the balance.' It was not my intention nor I didn't want to take anything from Mrs. Davis, if it come out it was her land; all I wanted was a little home. Well, Mr. Thomas, I would not be satisfied with a deed to 30 acres after I have had to have so much trouble. I wouldn't be satisfied with that now after it has gone this way. That was my offer that I would accept 30 acres. I got discouraged as soon as I found out these others didn't sign, and found out he didn't never come back, or send a letter to me in two or three weeks. I didn't know of his moving off to Catulla about that time, and I haven't seen him any since that time. * * * Mr. Wilson didn't say anything harsh to me; he treated me nice; he treated me as nice as people generally treat any one. Mr. Wilson appeared to be a gentleman and talked all right, he didn't use any harsh words; he didn't abuse me, or use any force; he came to me on business and stated his business, and he presented the instrument and I signed it; then he left; he didn't offer to do me any personal violence; nor he didn't tell me he would do me any personal violence, nor anybody else would; there was nothing of the kind said."

Wilson was a lawyer and had been employed by a son of Mrs. Davis to look after her lands. His testimony as to the circumstances under which the instrument was executed is as follows: "I was present when he signed and executed said instrument, and I am pretty sure his wife or some woman living with him was also present. Jim Moye did not read over the instrument because he could not read; at least he stated he could not. I read over the instrument very carefully and explained very carefully to Jim Moye just what the instrument was before he signed it and before he acknowledged it. I told him that the instrument he was signing was an acknowledgment by him that he did not own the land, but that it gave him a chance to buy and retain the land described in said instrument for his home. I positively did not represent to him the instrument was a power of attorney. No misrepresentation was made to Jim Moye; no force was used; nor threats made; in fact, nothing was done to mislead him or to induce him to sign this instrument. I asked Jim Moye if he owned the land he was living on, and he said no

that he did not own it, but that he had intended to buy it at one time, but that he had been unable to get a deed made to him for the land. He stated that he had been living on the land for 20 years and that he had been advised by certain white men that, if he would claim the land, he could hold it. I asked him if he thought it would be right to take some one else's property in that way when he had not paid for it, and he said that he did not think it would be right, and that he only wanted to do what was right. He further stated that he would be willing to buy the land and pay a reasonable price for it, but that he was getting so old that he could not make the money to buy 160 acres now; then I proposed to him that he buy 30 acres to include his improvements, and as described in the instrument attached to the interrogatories marked Exhibit A. The result of my proposition was that I wrote out said instrument and he signed it and acknowledged it."

Under an appropriate assignment of error, appellant assails the judgment on the ground that the evidence is insufficient to show that the execution of the contract and release above set out was obtained by fraud or false representations; and since, by the express terms of said instrument, plaintiff released to defendant his claim to all of the land, except the 30 acres therein described, he was only entitled to a judgment awarding him title to said 30 acres.

[1] We think this assignment should be sustained. The only statements made by Wilson to plaintiff which, according to plaintiff's testimony, were not true were the statement that other squatters on defendant's land had agreed to sign releases, and the statement that, if plaintiff did not execute the release, he would be without a home. Plaintiff testified that he was not influenced by the first statement to execute the release, and that he would have executed it if this statement had not been made. It is elementary that fraud or misrepresentation must be relied upon by the party who seeks to avoid his contract on that ground; and, unless he is induced by such misrepresentation to execute the contract, the validity of the contract is not affected thereby.

[2] The statement that, unless plaintiff signed the contract, he would lose his home was but the expression of Wilson's opinion upon a legal question. If he knew at that time that plaintiff had been living on the land and claiming it as his own for more than ten years, as a lawyer he must have known that plaintiff had acquired a title and was in no danger of losing his home. Plaintiff testified that he told Wilson he had been living on the place for 20 years, but it does not appear that he informed him that he had been, during all of that time, claiming the land adversely to Mrs. Davis, but, on the contrary, the inference from his statement

that he "did not intend or want to take anything from Mrs. Davis" is that Wilson understood that he had not been claiming adversely to the defendant; and, such being the case, the representation by Wilson that plaintiff had no title and that Mrs. Davis could take all of the land from him was fully justified.

[3] It appears from the testimony of both plaintiff and Mr. Wilson that plaintiff fully understood the contract and knew what he was doing when he signed it. We think this evidence falls far short of establishing the allegations of plaintiff's petition that the execution of this instrument was produced by "false and fraudulent representation" on the part of defendant's agent, or of showing that any advantage of any kind was taken of him in the procurement of said release. The sufficiency of the instrument as a release of all claim or title to all of the land, except the 30 acres, is not questioned.

[4] The trial court held that this instrument was void because the property was, at the time of its execution, the homestead of plaintiff and his wife, and the instrument is not signed by the wife. We think it is a sufficient answer to this contention that the issue of homestead was not raised by the pleadings. The validity of the release was not attacked on this ground; and, there being no pleading to support the finding that the property was a homestead, a judgment based on such finding cannot be sustained, notwithstanding the evidence may be sufficient to support a finding that plaintiff had acquired title by limitation before the execution of said release, and the property was at that time his homestead.

It follows from what we have said that the judgment of the trial court should be reversed and judgment here rendered for appellant for all of the 160 acres of land, except the tract of 30 acres described in the release before set out and the deed tendered plaintiff by defendant and which should be adjudged to plaintiff. Judgment of this court will be rendered and entered in accordance with these conclusions.

Reversed and rendered.